**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DAVID SANTANIELLO,<br>ROSANNE D. SANTANIELLO, and<br>LUIS MENESES, *individually and on behalf*<br>*of all others similarly situated*,<br><br>                    Plaintiffs,<br>v.<br><br>UNISON AGREEMENT CORPORATION,<br>REAL ESTATE EQUITY EXCHANGE,<br>INC., UNISON INVESTMENT<br>MANAGEMENT, LLC, and<br>UNISON MIDGARD HOLDINGS LLC,<br><br>                    Defendants. | **No.** |

**CLASS ACTION COMPLAINT**

### I.    PRELIMINARY STATEMENT

1.      On behalf of themselves and all others similarly situated, Plaintiffs David Santaniello, Rosanne Santaniello, and Luis Meneses bring this class action to redress the predatory residential mortgage loan scheme of Defendant Unison Agreement Corporation and its interlocking subsidiaries Real Estate Equity Exchange Inc., Unison Investment Management LLC, and Unison Midgard Holdings LLC. In order to access the vast amount of wealth New Jersey residents preserve in their home equity, Defendants market and sell residential mortgage loans unconscionably dressed up as complex and confusing financial "options" with the sole and overriding purpose to avoid the panoply of New Jersey legislation designed explicitly to protect homeowners against such products.

2.      The family home is a critical source of financial stability and security to citizens across the state of New Jersey and the nation. For that reason, state and federal law create strong

1

protections for homeowners in the field of mortgage lending, where people's homes are on the line.

3.      These safeguards are crucial for homeowners. But some companies such as Unison—the defendant here—coveting the vast amount of consumer wealth held in home ownership, choose to try to evade the rules by offering products with all the features of residential mortgage loans, falsely marketed and sold as complex financial "options."

4.      Defendants market and sell Unison "HomeOwner Agreements" that provide homeowners with a lump-sum cash payment today, minus several upfront transaction fees, in exchange for the right to recover that principal plus a future finance charge equal to 60 to 70% of any appreciation of the home's value (the "Appreciation Surcharge"), secured by a mortgage on the homeowner's residence.

5.      Although Defendants label these transactions as "options" or "investments" and tell consumers they are "not a loan," the transactions are, in substance and effect, residential mortgage loans with hidden finance charges that operate as balloon payments at the end of the loan term.

6.      Indeed, the Unison HomeOwner agreements have the core features of a reverse mortgage—namely, a nonrecourse transaction in which a mortgage secures an advance of money, where the principal plus any financing charges are recovered through collection against the home's equity when the consumer moves, sells the house, or dies—and they would be recognized, at the very least, as equitable mortgages under New Jersey law.

7.      Securities ratings agencies such as DBRS Morningstar expressly treat Unison's product as a reverse mortgage, with the principal differences being that, unlike reverse mortgages, Unison's product is "available to homeowners of any age" and "[w]hile a reverse mortgage loan achieves a return by accruing interest, an HEI achieves a return when the home price rises above

2

the exercise price of the option agreement." And Unison specifically requested DBRS Morningstar to perform a credit rating of the securitized pool of agreements, which used its reverse mortgage methodology in assessing the rating of Unison's products.

8.      Although Defendants claim that their right to repayment of the principal plus the Appreciation Surcharge is an "option" that they may or may not exercise when ripe, in reality, Defendants package and securitize these loans for sale to investors such that any possibility that they would voluntarily choose not to "exercise their option" in order to secure repayment is entirely illusory.

9.      And Defendants structured the agreements to ensure that they will effectively never receive less than the advance it paid to the consumer, going so far as to establish the base value of the home from which any equity appreciation is calculated at 2.5% to 5% below the actual appraised value and only lending pursuant to a sophisticated algorithm targeted to ensure appreciation of home values.

10.     Since 1968, residential mortgage lending has been regulated in New Jersey for the protection of homeowners, including by capping interest rates and by prohibiting the imposition of non-interest finance charges. N.J.S.A. § 46:10B-1 – 10.

11.     More recent laws such as New Jersey Home Ownership Security Act of 2002 ("HOSA"), N.J.S.A. § 46:10B-22 *et seq.*, and New Jersey Residential Mortgage Lending Act ("RMLA"), N.J.S.A. § 17:11C-51 *et seq.*—which was passed directly in the wake of the foreclosure crisis to address predatory lending practices that caused thousands of New Jersey residents to lose their homes—have deepened and expanded these protections, including expressly identifying what sorts of costs and charges may be assessed against a residential home mortgage loan.

12. Defendants' business model is an intentional end-run around these mortgage lending laws passed by the New Jersey legislature "to protect consumers seeking mortgage loans and to ensure that the mortgage lending industry operates without unfair, deceptive, and fraudulent practices[.]" N.J.S.A. § 17:11C-52.

13. By relabeling a mortgage loan as a "home equity investment" and "option," Defendants seek to avoid: (a) the licensing, fee restrictions, and other regulatory requirements imposed on residential mortgage lenders and brokers by the RMLA; (b) the consumer-protective disclosures and substantive safeguards that accompany residential mortgage lending; and (c) the prohibition in the federal Truth in Lending Act ("TILA") and Regulation Z against mandatory arbitration clauses in residential mortgage contracts.

14. In addition to misclassifying these loans as "options," Defendants knowingly and willfully charged fees to Plaintiffs and the members of the class that are prohibited under the RMLA, thereby forfeiting any claim to fees actually collected, as well as those charged against the equity of the property for future collection, and treble of the amounts collected. N.J.S.A. § 17:11C-81(a).

15. Defendants' business model is also an intentional end-run around the HOSA, which was designed to combat abusive and overreaching mortgage lending practices and to protect homeowners from loss of equity in their homes. N.J.S.A. § 46:10B-23(a)-(b).

16. The HOSA prohibits Defendants from using contract provisions that afford them sole discretion to accelerate indebtedness. N.J.S.A. § 46:10B-25(e). Yet this is precisely what Defendants' purported "option" is designed to do.

17. Defendants' claimed "option" and the various components of the transaction constituting its HomeOwner Agreement were surreptitiously designed, in bad faith, to avoid

4

application of the HOSA and residential mortgage lending laws generally, in violation of N.J.S.A. § 46:10B-27(d).

18.     Plaintiffs bring this consumer class action under the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. § 56:8-1 *et seq.*, the New Jersey Truth-in-Consumer Contract, Warranty and Notice Act ("TCCWNA"), N.J.S.A. § 56:12-14 *et seq.*, the New Jersey Home Ownership Security Act of 2002 ("HOSA"), N.J.S.A. § 46:10B-22 *et seq.*, the New Jersey Residential Mortgage Lending Act ("RMLA"), N.J.S.A. § 17:11C-51 *et seq.*, and under the common law to redress Defendants' deceptive, unfair, and unlawful business practices in connection with Defendants' so-called "home equity investment" products.

19.     Plaintiffs seek, on behalf of themselves and a proposed statewide class of New Jersey homeowners, damages, injunctive relief, and declaratory relief to restore the equity Defendants stripped them of through these predatory mortgages charging illegal fees and finance charges.

## II.    PARTIES

20.     Plaintiffs DAVID SANTANIELLO and ROSANNE D. SANTANIELLO (the "Santaniello Plaintiffs") are natural persons and residents of New Jersey. They own and reside in a one-family home located in Morristown, New Jersey.

21.     Plaintiff LUIS MENESES is a natural person and resident of New Jersey. He owns and resides in a one-family home located in Linden, New Jersey.

22.     Defendant UNISON AGREEMENT CORPORATION ("UAC") is a Delaware corporation with its principal place of business at 650 California Street, Suite 1800, San Francisco, California 94108 (and/or 4 Embarcadero Center, Suite 710, San Francisco, California 94111).

23.     UAC does business in New Jersey and, upon information and belief, is the entity that markets the HomeOwner product to consumers, contracts directly with homeowners, and is

5

named as the "Investor" and/or contracting party on Plaintiffs' HomeOwner agreements and related recorded instruments.

24.    Defendant REAL ESTATE EQUITY EXCHANGE, INC. d/b/a UNISON ("REX") is a Delaware corporation with its principal place of business at 4 Embarcadero Ctr Suite 710, San Francisco, CA 94111.

25.    Upon information and belief, REX is the corporate parent of UAC and Defendant Unison Investment Management, LLC, and it owns, directs, and profits from each stage of Defendants' HomeOwner scheme, including marketing under the "Unison" brand, setting underwriting/origination standards, and overseeing the assignment, securitization, servicing, and enforcement of HomeOwner agreements and the liens securing them.

26.    Defendant UNISON INVESTMENT MANAGEMENT, LLC ("UIM") is a Delaware limited liability company with its principal place of business at 650 California St, Suite 1800, San Francisco, CA 94108.

27.    Upon information and belief, UIM is a wholly owned subsidiary of REX that does business under the trade name "Odin Investment Management." UIM provides investment advisory, asset management, and related services to pooled investment vehicles and securitization trusts that acquire, hold, and profit from HomeOwner agreements and the liens securing them, and UIM (directly or through agents) services and administers those agreements, including collecting borrower information, calculating payoff demands, managing "protective advances," and coordinating enforcement.

28.    Defendant UNISON MIDGARD HOLDINGS, LLC ("UMH") is a Delaware limited liability company with its principal place of business at 650 California St, Suite 1800, San

Francisco, CA 94108. UMH is regularly assigned the HomeOwner Agreements at the time of closing.

29.     Upon information and belief, Defendants use a layered entity structure and internal division of labor to originate HomeOwner agreements while obscuring the identity of the true lender/creditor and evading liability: (a) UAC originates and executes HomeOwner agreements with homeowners and causes liens to be recorded against consumers' homes; (b) at or near closing, UAC assigns the HomeOwner agreements and lien instruments to affiliated companies, funds, and/or trusts managed and/or controlled by UIM and related entities such as UMH; (c) UIM and its affiliates act as servicer and asset administrator for the assigned agreements, including issuing payoff demands, managing accounting and "protective advances," and coordinating enforcement; and (d) REX sits at the top of the enterprise, controlling and profiting from the origination, assignment, servicing, securitization, and enforcement of the HomeOwner product.

30.     Upon information and belief, the corporate separateness of UAC, UIM, UMH, and REX (hereinafter "Defendants" or "Unison") is disregarded in practice and the entities act interchangeably in marketing, contracting, servicing, and enforcement under the "Unison" brand. Defendants share common ownership, centralized control, and unified operational objectives, and each Defendant knowingly participated in and benefitted from the unlawful conduct alleged herein.

## III.   JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because on information and belief, the parties are minimally diverse, the amount in controversy exceeds $5,000,000, and more than 100 individuals are members of the Class.

32.     This Court has personal jurisdiction over Defendants because Defendants transact business in New Jersey, market and sell the Unison HomeOwner product to New Jersey

homeowners, enter contracts secured by liens on New Jersey real estate, and cause injury in New Jersey by the conduct alleged herein.

33.    Venue is proper in this district because Plaintiffs and the class members reside in this district and the transactions and conduct at issue occurred in this district.

## IV.    FACTUAL ALLEGATIONS

### A. Unison Does Not Comply with the Federal and State Laws Put in Place to Protect Homeowners from Complex and Confusing Mortgage Products Like Unison's

34.    Congress and the New Jersey legislature have both passed laws to protect homeowners like Plaintiffs and proposed class members from complex and confusing financial products that can cause people to lose their homes.

35.    While the federal Truth in Lending Act protects all borrowers, residential mortgages have special protections. Congress passed these protections to "assure that consumers are offered and receive residential mortgage loans on terms that reasonably reflect their ability to repay the loans and that are understandable and not unfair, deceptive or abusive." 15 U.S.C. § 1639b(a)(2).

36.    The Truth in Lending Act ("TILA") defines a "residential mortgage loan" as "*any* consumer credit transaction … secured by a mortgage, deed of trust, or other equivalent consensual security interest on a dwelling." 15 U.S.C. § 1602(dd)(5) (emphasis added). A transaction qualifies whenever (1) "credit is offered or extended" to (2) "a natural person," and (3) "the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1602(i).

37.    Under TILA, residential mortgage lenders must ensure that homeowners have the ability to repay the loan, 15 U.S.C. § 1639c(a)(1), and they must be licensed under applicable federal and state laws, 15 U.S.C. § 1639b(b)(1)(A).

38. Congress also sought to ensure that homeowners can vindicate these and other rights in court by prohibiting mandatory arbitration clauses in any "residential mortgage loan." *Id.* § 1639c(e)(1).

39. New Jersey law provides additional protections for homeowners in the market for mortgage loan products.

40. Since 1968, New Jersey has capped interest rates and prohibited the imposition of non-interest finance charges, defined as "points" or "an amount of money or other consideration paid for the making of a mortgage loan," in connection with a mortgage loan. N.J.S.A. § 46:10B-10.

41. New Jersey requires that only licensed mortgage lenders can offer mortgage products. *See* N.J.S.A. § 46:10B-18.

42. New Jersey requires disclosures and protections for mortgages generally, *see generally* N.J.S.A. § 17:11C-75, as well as special requirements for high-cost mortgages, *see* N.J.S.A. § 46:10B-26.

43. New Jersey prohibits the imposition of fees and charges related to mortgages not expressly identified by law. N.J.S.A. § 17:11C-75(l).

44. New Jersey prohibits contract provisions that afford lenders the sole discretion to accelerate indebtedness on a mortgage. N.J.S.A. § 46:10B-25(e).

45. New Jersey prohibits dividing each loan transaction into separate parts and the use of similar subterfuge in contracting in order to evade residential mortgage regulations under HOSA. N.J.S.A. § 46:10B-27(d).

46. And New Jersey prohibits any efforts to waive provisions of the RMLA. N.J.S.A. § 17:11C-86.

9

47.    Unison, however, does not follow these laws. Instead, the company claims that it is entirely exempt from any federal and state lending laws because its product is not a mortgage loan.

48.    But no matter how Unison labels its product, it is a mortgage loan. Unison provides homeowners with an advance of money, receives security through a mortgage on their home, and requires repayment of the principal along with a finance charge. That is a mortgage loan.

49.    Unison's primary contention is that its product is not a loan because the company is not explicitly guaranteed to be paid back its initial advance.

50.    But both federal and state courts look to substance over form to ensure that mortgage laws will protect homeowners from an ever-evolving world of complex financial products. *See, e.g.*, *Rossman v. Fleet Bank (R.I.) Nat'l Ass'n*, 280 F.3d 384, 394 (3d Cir. 2002); *Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993); *Merck & Co. v. United States*, 652 F.3d 475, 483 (3d Cir. 2011); *Zaman v. Felton*, 98 A.3d 503, 513 (N.J. 2014).

51.    And these relevant laws cover a broad range of products with many different forms of payment obligations, not all of which require the borrower to personally pay the lender back in full in all instances. *See, e.g.*, 15 U.S.C. § 1602(cc) (including "nonrecourse transaction[s]"); *Burnett*, 3 F.3d at 1262; *Zaman*, 98 A.3d at 513.

52.    In any event, Unison does ensure that, in practice, it will obtain repayment (plus a finance charge) of its initial advance payment, securing through the mortgages recorded against Plaintiffs' and class members' homes the "performance of those obligations to Mortgagee … including, without limitation, payment of the Investor Interest under the Unison Unison [sic] HomeOwner Agreement." Ex. A at 45 (Santaniello) and Ex. B at 53 (Meneses), Unison HomeOwner Mortgage and Security Agreement ¶ 2(b)(v).

53.     All of Unison's "Option Exercise Events" require Plaintiffs and class members to pay Unison pursuant to this mortgage, and there are no actual circumstances in which Unison would not demand repayment.

**B. Unison's Product Is Designed to Provide Investors Access to the Multitrillion Dollar Home Equity Market at the Expense of Consumers**

54.     According to Unison's 2024 Home Equity Report, the American home equity market has "reached new heights." As of June 2024, the market totaled $35 trillion. Older adults often have the highest level of home equity—valued at $14 trillion—because they have owned their homes the longest.

55.     Across the country, homeownership remains one of the most reliable ways to build wealth, primarily through the gradual accumulation of home equity. In New Jersey, between 2020 and 2025, the average household equity grew by 122%.[1]

56.     As Unison itself reports, "[f]rom September 2023 to September 2024, median home equity growth was positive in 45 out of 50 states. Connecticut (24.6%), New Jersey (22.3%), and Delaware (18.3%) experienced the highest growth in home equity … ."[2]

57.     Home equity plays a critical role in homeowners' financial security. Many homeowners access their home equity to supplement their retirement or pay off debts. Others use home equity to pay for significant expenses such as home improvements, education, healthcare costs, or long-term care. Products that allow homeowners to access their equity for these reasons

---

[1] Mike Winters, *How home equity has changed in every U.S. state since 2020,* CNBC (Aug. 15, 2025), https://www.cnbc.com/2025/08/15/home-equity-changes-for-all-50-states-in-the-last-5-years.html.

[2] Jian Tong Chua and Winfield Xu*, 2024 Unison Home Equity Report*, https://www.unison.com/blog/home-equity-report-2024

are commonplace and include home equity lines of credit (HELOC), home equity loans (sometimes referred to as a second mortgage), cash-out refinances, and reverse mortgages.

58.    In the early 2000s, Thomas Sponholtz (Sponholtz), the founder and Chief Executive Officer of Unison, got the "big idea" for Unison's home equity product. The idea came to him while working at Barclays Global Investors and "looking around for large asset classes [he] could add to [his] client's portfolio." Sponholtz noticed that the residential real estate market was largely untapped by institutional investors, despite it being the "largest asset class, both globally and in the U.S."[3]

59.    The absence of institutional investors in the market was driven by the burdens associated with the traditional way of investing in and profiting from residential real estate, which requires purchasing a home and renting it or reselling it. Sponholtz recognized that this method of investment is often inefficient and comes with "tremendous amount of administrative cost in maintaining and being a property manager of [] homes."

60.    With his investor-clients in mind, Sponholtz created Unison. Unison gives investors access to the residential real estate asset class—that is, to the equity that individual homeowners have accrued over time—through Unison's "equity sharing" products. In essence, these products are designed to allow Unison to claim a portion of homeowners' equity without taking on any of the concomitant costs, labor, burdens, or obligations of homeownership or real estate management.

61.    The products work by Unison providing homeowners an upfront cash payment in exchange for a purported "option" to demand repayment of the principal plus a substantial share of the home's appreciation in value out of the home's equity.

---

[3] Lend Academy, *Thomas Sponholtz and Jim Riccitelli of Unison*, (June 7, 2017), https://www.heyfuturenexus.com/podcast-103-thomas-sponholtz-jim-riccitelli-unison/.

62. The homeowner retains obligations during the pendency of the agreement, including all responsibility for the costs, labor, and burdens of homeownership, while Unison and its investors reap the rewards of any equity appreciation in the home without purchasing or maintaining the home themselves.

63. Further, Unison deploys a variety of mechanisms throughout the transaction to all but guarantee against the risk of any loss for the company, including lowering the starting values of homes on the front end and then inflating the values on the back end to maximize the equity Unison can extract from the homeowner at the conclusion of the transaction. Unison also requires the homeowner to pay all transaction fees at the start of the agreement, and upon a sale of the home.

64. As of today, Unison's website boasts that the "total value of homes [it has] invested in across the country" is $8.8 billion. Unison has agreements with over 10,000 homeowners and a wide geographical presence, operating in "30 states + Washington, D.C." Unison has hundreds of agreements in New Jersey alone, and continues to enter into new agreements within the state.

65. Together, Unison notes, the markets in which it offers its product make up more than 83% of U.S. real estate by value. It is no coincidence that Unison operates in markets that represent the vast majority of the country's real estate value. Unison has a "10-year forecast on every house in America" and uses its "proprietary investment decision engine" to carefully select the markets in which it will operate. The investment decision engine "capture[s] and integrate[s] the most recent market and industry research about real estate, demographic trends, and key economic indicators such as employment and population growth. . . . With this information, Unison

seeks to invest in Unison Agreements on properties that it believes have a greater likelihood of appreciation."[4]

66.    Unison's investment decision engine has paid off, at least for Unison and its investors. Notably, Unison describes "institutional investors" and "high net worth individuals" as "typical" investors. Over the ten-year period from 2012 to 2022, Unison had a net annualized return of 20.7% for its investors.

67.    Unison touts the "unlimited upside and limited downside" of its product to its investors, highlighting that "residential real estate has historically generated strong returns," and that its portfolios provide "low volatility and high risk-adjusted net returns."

68.    In recent years, Unison has begun securitizing its product. To date, it has securitized over a billion dollars of its agreements in at least three different funds managed by UIM, further filling the coffers of Unison investors.

69.    Thus, the truth is that Unison's business model is designed to benefit its high net worth individual and corporate investors, not the homeowners it purports to help.

70.    Unison's Sponholtz has publicly clarified that notwithstanding the standard 30-year contract term, the average time to payout from the consumer through a home sale or homeowner buyout is ten years:

> [Question:] So I want to ask about duration here because you said it was a minimum of three years, maximum of 30, what are your expectations around the duration on average that each homeowner is going to...your money is going to be tied up?
>
> [Sponholtz:] Yeah, this is Thomas, the short answer is ten years. Then the distribution around the ten years is pretty much a normal

---

[4] Unison Investment Management, LLC, Finn Brochure at 8 (Form ADV Part 2A) (June 23, 2025), https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd iapd Brochure.aspx?BRCHR VRSN ID=982540.

distribution, meaning that the average is around ten years and then some homeowners, of course, move sooner or sell their house sooner or buy us out and others stay in their home for 10, 20, 30 years.[5]

**C. Defendants' Layered Entity Structure Is Designed to Originate, Assign, Service, and Monetize the Same HomeOwner Agreements.**

71. Defendants' HomeOwner product is marketed to consumers under a single brand—"Unison"—but, upon information and belief, Defendants intentionally divide the origination, assignment, servicing, and enforcement functions among multiple related entities and affiliate investment vehicles to conceal the true creditor, evade state mortgage-lending oversight, and capture revenue at every stage.

72. UAC serves as the front-end originator and contracting party, charging and collecting origination-related fees and causing the HomeOwner Security Instrument and/or other lien instruments to be recorded against consumers' homes. Although consumers are told they are entering a "home equity investment" and "not a loan," UAC's HomeOwner agreements are structured to create and enforce a home-secured payment obligation, and the recorded lien functions like a subordinate mortgage.

73. At or near origination, UAC assigns the HomeOwner agreements and recorded liens to affiliated entities and pooled investment vehicles managed and/or controlled by UIM and related entities. These assignees become the creditor and/or beneficiary of record, profit from payoff demands and recoveries taken from homeowners' equity, and rely on UIM and its affiliates to service and administer the agreements.

---

[5] *Peter Renton, "Podcast 103: Thomas Sponholtz and Jim Riccitelli of Unison,"* Future Nexus (June 2, 2017), *available at* https://www.heyfuturenexus.com/podcast-103-thomas-sponholtz-jim-riccitelli-unison/.

74. UIM (d/b/a Odin Investment Management) functions as the servicer and asset administrator for assigned HomeOwner agreements, including maintaining borrower files, calculating and issuing payoff demands, managing "protective advances," accounting for purported "investor interests," and coordinating enforcement.

75. Upon information and belief, REX, as the corporate parent and controlling entity, directs and benefits from this closed-loop structure and the revenues it generates, including transaction fees, servicing/administrative fees, and the extraction of home appreciation.

76. Defendants monetize HomeOwner agreements not merely by holding them to maturity, but by pooling and packaging the agreements into investment products for institutional investors. UIM and related entities structure and manage these pools, calculate and distribute investor returns, and collect management and administrative fees—creating additional profit streams tied directly to the origination and enforcement of the same consumer HomeOwner agreements that Defendants market to homeowners as "investments" and "partnerships."

77. None of the Defendants were licensed under the RMLA to make residential mortgages until January 2025.

**D. Defendants' "Home Equity Investment" Is Secured by a Recorded Residential Lien.**

78. Defendants offer consumers a standardized set of contracts typically referred to as the Unison "HomeOwner Agreement." The HomeOwner Agreement is comprised of multiple documents, including at least: (a) a HomeOwner Option Agreement; (b) a HomeOwner Covenant Agreement; (c) a HomeOwner Mortgage and Security Instrument; and (d) a Recorded Memorandum of the HomeOwner Agreement.

79. What is believed to be a true and correct copy of the HomeOwner agreement between Unison and the Santaniello Plaintiffs is attached as Exhibit A. What is believed to be a

16

true and correct unsigned copy of the HomeOwner agreement between Unison and the Plaintiff Meneses is attached as Exhibit B.

80.    Plaintiffs' agreements expressly state that the homeowner's performance under the HomeOwner Agreement "will be secured as a recorded lien on the Property" by recording "both the Security Instrument and the Recorded Memorandum" in the county where the property is located.

81.    Because Defendants record a lien against the consumer's dwelling, the transaction is secured by real property in the same manner as a traditional mortgage or reverse mortgage.

82.    Defendants' lien restricts the homeowner's ability to sell, refinance, or obtain additional home-secured financing without Defendants' consent and gives Defendants enforcement rights typical of mortgage creditors.

83.    That mortgage also states that it "is intended to be, and shall constitute, a security agreement under the Uniform Commercial Code, as adopted or enacted and thereafter modified under the laws of the State or Commonwealth of New Jersey." Ex. A at 46 (Santaniello) and Ex. B at 54 (Meneses), Unison HomeOwner Mortgage and Security Agreement ¶ 3.

84.    It further provides that Unison is entitled to file the mortgage as a "UCC-1 Financing Statement" pursuant to the UCC, *id.* ¶ 3(b), and that the mortgage itself "constitutes a financing statement filed as a fixture filing" pursuant to the UCC, *id.* ¶ 3(c).

85.    Under the New Jersey Uniform Commercial Code, a financing statement records the security provided by a "debtor." N.J.S.A § 12A:9-502. As the New Jersey Department of Treasury explains: "Uniform Commercial Code (UCC) financing statements record and protect a secured party's interest in the *collateral offered a debtor for a loan*. The UCC system gives public

notice of the *debtor*-secured party relationship and the collateral involved." File UCC Financing Statements, N.J. Dep't of Treasury, https://perma.cc/XDH7-Z5RS (emphases added).

86.    And the mortgage itself also expressly recognizes that it exists to secure the principal of the loan, providing that that the "Mortgagor will not make deduction from or claim credit *on the principal or interest secured by this Security Instrument* by reason of any governmental taxes, assessments or charges." Ex. A at 51 and Ex. B at 59 (Meneses), Unison HomeOwner Mortgage and Security Agreement ¶ 20 (Santaniello) and ¶ 19 (Meneses) (emphasis added).

### E. The HomeOwner Agreements Are Loans Secured by Residential Mortgages Stripped of Statutory and Regulatory Protections

87.    The transactions at issue here are home loans. Unison extends credit to Plaintiffs and class members. This extension of credit is primarily for personal, family, or household purposes. And the extension of credit is secured by a mortgages on real estate in this State on which there is located a dwelling which is occupied by the borrower as the borrower's principal dwelling.

88.    However, when making a formal offer to consumers, Defendants tell consumers that the HomeOwner product is "not a loan" but is instead an "option."

89.    Defendants' form HomeOwner Agreement states: "The Initial Payment is not a loan to you or indebtedness to Investor, nor is it a principal amount which Investor is entitled to recover at any time."

90.    By affixing the "option" label to its product, Unison has developed a self-serving regulatory vacuum, where ostensibly no credit or mortgage regulation is necessary or applicable to it. However, the "option" label merely exalts form over function—and reality.

91.    In reality, Defendants advance cash to the homeowner at origination and obtain, in exchange, a secured right to receive a future payoff from the homeowner's home equity, in an amount that is calculated to substantially exceed the cash advanced. As Morningstar DBRS explains, "Upon repayment, an HEI Investor [*i.e.,* Unison] is typically expecting to receive (1) the initial principal advanced, plus (2) some additional money without which the investment would yield no return."

92.    This "additional money" is, in substance, a "finance charge." "The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4.

93.    In the HomeOwner Agreement, as further described below, the finance charge is calculated as 60% to 70% of appreciation in the home's value from the original starting value after imposing a "Risk Adjustment" on that original appraised value. Throughout this complaint, this finance charge will be referred to as the "Appreciation Surcharge."

94.    The HomeOwner Agreement describes the consumer's obligation as a "buy out" payment to terminate the investor's rights upon an "Exercise Event" or alternatively an "option" that Unison has sole discretion to exercise to accelerate the repayment at the end of the term. But regardless of label, the effect is that consumers must pay Defendants a lump-sum payoff from their home's value, or else lose the home through sale or enforcement.

95.    Under Plaintiffs' standardized HomeOwner Agreement, Defendants' right to payment is triggered by the same events that commonly trigger repayment obligations in residential home-secured mortgage lending, including: (a) a sale of the property; (b) the death of the "last surviving signatory"; and (c) a material, uncured event of default.

19

96.     The HomeOwner Agreement also affords Unison the right, in its sole discretion, to accelerate the principal and finance charge at the end of the contract term, with such payment being secured by the mortgage lien on the home.

97.     The HomeOwner Agreement further provides that, upon expiration of the term or the homeowner's death, the parties "will promptly market and sell the Property" in order to liquidate their respective interests.

98.     Ultimately, the only thing "contingent" about Plaintiffs' obligation to repay the loan through either a "buy out" or the liquidation of Defendants' equity in the home is when it occurs. There are no doubts over whether Defendants will demand repayment at some point, if only to fulfill their own legal obligations to investors in the pools of HomeOwner Agreements that they've securitized.

99.     Unison's entire business model is to enter into Agreements that will result in Unison reaping a return. It carefully selects favorable markets in which to offer its product, touts to its investors that the Agreements have "unlimited upside" and only "limited downside," and 20.7% annualized returns over a ten-year period.

100.    And, although the final payment amount is unknown at time the Agreement is signed, numerous statements made by Unison indicate that the payment obligation at the end of the Agreement is absolute. The Offer Package explains "[i]f you have not sold your Property or otherwise terminated the Unison HomeOwner Agreement by the end of the thirty (30) year Term, you will need to sell the Property or otherwise settle the Unison HomeOwner Agreement by paying Unison an amount equal to the value of its investment interest in the Property at that time."

101.    And, in practice, because Unison has legal obligations to its investors to deliver returns on the HomeOwner Agreements through the securitized pools, Unison will always

"exercise" its "option" to demand repayment of the original principal of the loan plus the finance charge.

102. In the Frequently Asked Question Section, on Unison's website one question reads: "What happens at the end of the agreement?" The response is: "You can use the funds provided by Unison for up to 30 years. After 30 years, you will need to either sell your home or buy us out."

103. The amount owed to Defendants upon buyout is computed by a contractual formula tied to the home's "Ending Agreed Value." In Plaintiffs' agreements, the HomeOwner Agreement provides that "Investor Interest" is calculated by multiplying the Ending Agreed Value by the "Investor Percentage;" subtracting the "Balance Payment;" and then adding any "Unpaid Owner Obligations."

104. The "Balance Payment" is calculated at the time of contracting by multiplying the "Original Agreed Value" of the home times 60% to 70% and then subtracting the loan amount, identified as the "Initial Payment" in the agreements.

105. While the formula is confusing, the structure functions to ensure that if the home maintains or increases in value, Unison is entitled to recover the principal of the loan plus 60% to 70% of the appreciation.

106. Moreover, the "Original Agreed Value" is set at a 2.5% to 5% discount from the actual appraised value of the property in a so-called Risk Adjustment. This ensures that in case of a minor decrease in value up to the Risk Adjustment, Unison will still be entitled to collect at least the original principal. And, if the property maintains its value, Unison will be entitled to collect the original principal plus an Appreciation Surcharge of 60% to 70% of at least the Risk Adjustment. Thus, at the moment the agreement is signed, Unison is immediately entitled to recoup both the principal plus the Risk Adjustment of 1.5% to 3.5% of the property's value against its

equity. As DBRS Morningstar explains, "the Option Agreement starts 'in-the-money' and can remain so under modest price declines from the appraised market value."

107. Defendants' HomeOwner agreements also restrict consumers' ability to obtain other home-secured financing. For example, the HomeOwner Agreement defines and limits the homeowner's "Maximum Authorized Debt"—the sum total of third-party loans secured by liens on the property—thereby operating like a subordinate mortgage that limits the homeowner's ability to refinance or access equity elsewhere.

108. The transaction at issue also meets the definition of an equitable mortgage under New Jersey law, as the Supreme Court in *Zaman* explains "If a deed or contract, lacking the characteristics of a common law mortgage, is used for the purpose of pledging real property, or some interest therein, as security for a debt or obligation, and with the intention that it shall have effect as a mortgage, equity will give effect to the intention of the parties. Such is an equitable mortgage." 98 A.3d at 513.

### F. Unison's Product Does Not Have Characteristics Common to "Options"

109. In addition, while the Unison product does have the characteristics of a mortgage loan, its product does not have the characteristics of an option, including:

110. Unlike with a typical option contract, the contract terms demonstrate that Unison does not intend to own the real property on exercise of its so-called "option." Instead, the transaction is structured to so that that Unison is paid back financially, primarily either through forced or voluntary sale.

111. As described above, the product shifts all risk and costs onto consumers and is designed to ensure that Unison will always benefit from exercising the option, unlike a true option contract.

22

112.    The homeowner has a contractual right to "buyout" Unison's purported "option" to acquire a percentage interest in the home, which is not a feature of a typical option contract and reflects Unison's true intention that consumers pay back Unison at a profit.

113.    A standard option creates a contractual right only, not a property right. Here, Unison's mortgage on the consumer's home and various contractual terms creating obligations on the homeowner throughout the life of the contract gives it not just a "contractual right" to purchase home equity in the future, but an immediate interest in the property in the present.

114.    A typical option to purchase real estate involves both consideration for the option agreement, and consideration representing the purchase price if the option is exercised. Here, Unison has structured its product so that, rather than paying for the property at the time of exercise and paying a small "option payment" as consideration for holding the offer open, Unison pays the purported "purchase price" for the consumer's home equity upfront through the "initial payment," that is the loan itself. The "balance payment," which Unison describes as "[t]he additional dollar amount required to exercise the Option," is not an actual payment at all, but instead an accounting figure used to calculate Unison's entitlement to the principal of the loan plus the Appreciation Surcharge.

### G. Defendants' Product Is Unconscionable and Deceptive and Conceals or Suppresses Material Terms about the Transactions

115.    Unison's product may be alluring to a homeowner looking to access their equity. After all, homeowners are told by Unison that they can access cash to "live the life you really want" with "no added debt, no interest and no monthly payment."

116.    These statements are false. Unison's product does create debt and carries significant finance charges at the end of the term that enable Unison to profit.

117.   Under the Agreement, homeowners will, in the vast majority of circumstances, be required to pay Unison more than they were advanced. Additionally, if Unison makes protective advances on behalf of a homeowner, those explicitly accrue interest at 1.5% per month.

118.   Unison's statements that its product is not a loan are unfair and deceptive for the reasons discussed herein, and designed to lure homeowners into its product, rather than other, potentially more suitable, equity products. In quarterly statements to homeowners, Unison continues to describe itself as an "equity-sharing agreement" rather than a loan.

119.   Nor does Unison make clear to homeowners the amount of total costs associated with its product, including information on total fees and costs to be paid at initiation, termination, and throughout the transaction.

120.   Unison further misleads homeowners about the total cost of the transaction by representing that its product is "better than a traditional home equity line of credit," but not providing homeowners with proper comparison tools for other traditional equity products that may be better suited for the homeowner.

121.   Unison claims it is not required to disclose information about the total costs of the Agreement because it is not a mortgage or a loan. But Unison's product is a loan and those disclosures are required.

122.   Even if the product were not a loan, however, the Agreement is unconscionable and deceptive and conceals material terms because it misleads and confuses homeowners as to the total cost and ultimate payment obligations due.

123.   This risk is not just theoretical, as the amount due at the end of the Agreement can be in the hundreds of thousands of dollars. Many homeowners will be forced to sell their home to satisfy the payment or face foreclosure.

124.    The details and obligations imposed by the Agreement are spread across multiple separate documents that collectively span a hundreds of pages. Those documents include the HomeOwner Covenant Agreement, the HomeOwner Option Agreement, the Memorandum of Unison HomeOwner Agreement, the Unison HomeOwner Security Instrument, the Unison Closing Statement, the Unison HomeOwner Agreement Closing Instructions, the HomeOwner Program Guide, a Deferred Maintenance Addendum, a Notice and Acknowledgment for Non-Signatories to the Agreement, and various title documents, among others.

125.    These documents contain confusing cross-references, dozens of definitions (many of which also contain cross-references), and several complex mathematical formulas for repayment.

126.    Examination of the various payment formulas embedded in the Agreement highlight how difficult, if not impossible, it is for a homeowner to understand how much they will owe Unison at the conclusion of the Agreement. This is true not only at the time they enter the Agreement, but also throughout the duration of the Agreement.

127.    For instance, although functionally repayment works out to the principal advanced plus 60% to 70% of any appreciation from the "risk-adjusted" original value of the home, the definitions and calculations used to get there are unnecessarily complex in order to obscure the fact the product is a loan for which repayment of the principal is critical.

128.    Thus, theoretically, the "Balance Payment" is the amount of the purported "second payment" Unison will pay the homeowner upon an Exercise Event. In reality, this "payment" is merely an accounting offset to account for the limited equity the consumer retains in the home. No "Unison Purchase Price Balance" is ever actually deposited into a homeowner's account.

129. But, because the "Unison Purchase Price Balance" amount is prominently displayed, and routinely reaches into the six figures, it can mislead consumers, causing them to either misunderstand how much they will owe or inducing them to believe they will receive a deposit of a significant sum of money at the conclusion of the Agreement.

130. Other confusing terms and conditions buried deep in the agreements can further erode the consumer's equity in the property, or provide Unison unfair leverage during future settlement of the loan. For instance, there is a "Deferred Maintenance Adjustments" which permits Unison to recoup additional equity in the house if the house declines in value due to a failure of the consumer to maintain the property or "a condition or defect in, or damage to the Property or its title."

131. Moreover, even without taking into account such adjustments, simply determining what the "Ending Agreed Value" will be requires working through an entirely separate schedule, Schedule B, which includes nine different possible loan termination events that produce eight different possible "Ending Agreed Value" formulas, through which the final Appreciation Surcharge will be calculated. These various permutations of end value incorporate such a variety of defined terms as the "Effective Sale Price," the "Original Agreed Value," the "Appraised Value," and the "Solicited Sale Value."

132. Thus, although the Agreement documents set forth the potential cost and repayment formulas, those repayment formulas do not inform homeowners of the actual costs of the product because they are complex, confusing, contingent on future events, and require inputs that are unknown and unknowable at the time of signing, and that cannot be known until payment actually becomes due.

133.   Furthermore, as a key part of their marketing, Defendants represent to consumers that they a "partner" with the homeowner. This representation is made repeatedly throughout Unison's website and marketing materials with statements like "We win when you win" and "Unison is your partner, here when you need us."

134.   This includes a marketing video on Unison's website and YouTube that emphasizes the purported partnership aspect of the Agreement. The video explains that Unison is a "partnership, fair and square and yes, it's kind of cool."[6]

135.   The video continues: "Again, we're partners ... so we split the change in value of your home, even if your home depreciates, we actually take the hit along with you. You heard that right. Either we both profit or we both share in the loss. That's what we mean by a fair partnership. We're truly there with you through the ups and the downs."

136.   Additionally, Unison's quarterly statements repeat that it is a "financial partner" who would "love to help" if the homeowner is experiencing financial challenges.

137.   These representations are intended to lead the homeowner to believe that they are, in fact, partners with Unison and that they will share together in the increase or decrease in the value of the home. This gives consumers an inaccurate impression of the relationship and the terms of the Agreement, and builds false trust that induces them to enter into the Agreement.

138.   In reality, Unison's business model is designed to benefit its high net worth individual and corporate investors, not the homeowners it misleadingly calls "partners."

139.   Despite all these representations made in the marketing materials, the Agreement itself expressly disclaims any partnership relationship with the homeowner, directly contradicting

---

[6] Unison, How it Works - Unison Equity Sharing — Homeowner, YouTube (June 30, 2023), https://www.youtube.com/watch?v=KG7ygY6 sWM.

Unison's other representations. That provision, titled as "Relationship," states that "[Unison] shall not be deemed a partner, joint venturer, trustee, agent, representative, lender or fiduciary with, or of, you." HomeOwner Covenant Agreement § 19.5.

140. This makes sense, because one aspect of a partnership is a fiduciary relationship. Unison could not possibly abide by this duty with homeowners, given its obligations to increase returns for its investors.

141. Additionally, Unison is not a partner in even the layman's sense of the word. Unison has built into the Agreement a variety of mechanisms designed to ensure it will maximize the Company's return and minimize risk, even if the home value depreciates, including by manipulating the Original Agreed Value, requiring the homeowner to shoulder all costs, and having significant influence over the Ending Agreed Value.

142. Further, the representation that Unison will share in any decrease in value of the home is deceptive and misleading because in certain circumstances, Unison expressly disclaims a share of any depreciation. If the homeowner exits the Agreement during the first five years or elects a "Special Termination," Unison does not share in any decrease in value.

143. Defendants' product is also unconscionable to the extent that it imposes onerous and restrictive conditions on consumers' uses of their own properties including prohibiting renting it out, using it as a non-principal residence, using the property for commercial purposes, providing the conditions and procedures for any listing or sale of the property and permitting Unison to intervene in any sale it believes is valued too low, and limiting additional liens or encumbrances on the property.

144. Many of these restrictions are recorded with the local county record's office as "Covenants Running with the Land."

28

145.     This is despite representations that the homeowner will maintain "control [of] the property and receiving] the benefits of home ownership, such as occupancy rights."[7]

146.     These limits can place homeowners in an extremely difficult position. As an example, the homeowner must keep the home at a certain level of repair under the Unison Agreement. If performing repairs or upgrades is required, homeowners may need to use additional financing products or take on more debt. But the Unison Agreements prevents homeowners from doing so without Unison's signoff, especially if it would result in the homeowner exceeding the maximum debt amount.

147.     Furthermore, the HomeOwner Agreement deceptively labels the product as "not a loan" in order to attempt to strip home owners of their rights to access federal and state courts statutorily ensured through 15 U.S.C. 1639c(e)(1) which prohibits "terms which require arbitration or any other nonjudicial procedure as the method for resolving any controversy or settling any claims arising out of the transaction" for any "residential mortgage loan."

## H. Defendants Charge or Receive Fees That Are Disallowed under New Jersey's Residential Lending Laws

148.     In deceptively packing their product as an "option" and "not a loan," Defendants surreptitiously and deceptively charge fees that are impermissible under the RMLA.

149.     In passing the RMLA, the New Jersey Legislature clearly established the fees and costs that lenders were permitted to charge related to residential mortgages and prohibited those that were not expressly provided for. *See* N.J.S.A. § 17:11C-75(l) ("No residential mortgage lender, residential mortgage broker, or mortgage loan originator shall charge or exact directly or indirectly from a borrower or any other person any commission, bonus, fee, or charge not

---

[7] *If I partner with Unison, who owns the home?,* Unison, https://www.unison.com/faqs/equitv-sharing-agreenient.

authorized by this act."); *see also* N.J.S.A. § 17:11C-74(a) (setting forth permissible fees "incidental to the origination, processing and closing of any mortgage loan transaction"); N.J.S.A. § 17:11C-80(a)–(b) (setting forth expressly impermissible fees "in connection with a secondary mortgage loan").

150.    Notwithstanding these broad prohibitions and the narrow allowance for a limited subset of specified fees and charges, Defendants regularly charge, receive, and collect, directly and indirectly, impermissible charges including a "Transaction Fee," a "Settlement Fee," and the Appreciation Surcharge. None of these fees are expressly allowed under the RMLA.

151.    Additionally, Defendants surreptitiously and indirectly charge a fee to consumers by effectively reducing the home's appraised value by a Risk Adjustment of 2.5% to 5% at the very outset of the loan term. Because the "original agreed value" acts as the baseline from which any future appreciation in value is "shared," Defendants immediately award themselves 60% to 70% of the difference between the actual appraised value and the "risk adjusted" value attributable to the Appreciation Surcharge, which is yet another way that Defendants strip homeowners of the equity in their homes to ensure that they are "in-the-money" for their investor-clients from the get go.

152.    The legal consequence for charging more than the fees and charges allowed include, *inter alia*, forfeiture of all fees, costs, and charges, and treble the amounts collected: "If a residential mortgage lender charges or collects interest, costs or other charges on a secondary mortgage loan in excess of those permitted by this act, the licensee may collect only the principal amount of the loan, and may not collect interest, costs or other charges with respect to the loan. In addition, a licensee who knowingly and willfully violates any provision of this act shall also forfeit

30

to the borrower three times any amount of the interest, costs or other charges collected in excess of that authorized by law." N.J.S.A. § 17:11C-81(a).

### I.   Defendants' Incomplete and Deceptive Offer Packages.

153.   At the outset of a transaction, the homeowner is typically provided an "Offer Package" spanning over a dozen pages.

154.   In at least 2022 and 2023, Defendants provided New Jersey consumers with a standardized, multi-page "Offer" and "Disclosure Notice and Cost Estimate" package before closing.

155.   The Offer Package frames the transaction as an "option contract" structure, describing an "Initial Payment Amount" or "Co-investment Amount" at closing and a larger "Balance Payment" at termination, and emphasizes that it is "unlike a loan."

156.   Critically, however, the Offer Package does not itself provide the consumer with the complete set of legal agreements that comprise the HomeOwner Agreement. Instead, Defendants instruct consumers that, if they want to review the full legal agreements, they must contact their Program Specialist to obtain them. This language, however, is not bold, underlined, or otherwise emphasized, unlike other aspects of the Offer Package.

### J.   Plaintiffs Entered into Deceptive and Unconscionable Contracts with Defendants That Charge Illegal Fees and Strip Equity from Their Homes.

157.   **Plaintiff Meneses's Transaction**. In July 2022, Plaintiff Meneses was in financial distress, having to pay a preexisting mortgage on his home and tens of thousands of dollars in auto and credit card debt.

158.   On or about July 7, 2022, Unison sent a notary to Plaintiff Meneses's home with the documents he was required to sign. The notary could not answer any questions relating to the underlying transaction; the notary's role was limited to directing him where to sign.

31

159. During the interaction with the notary, Plaintiff Meneses entered into a Unison HomeOwner Agreement relating to his residence in Linden, New Jersey. The HomeOwner Agreement reflects (among other terms): an original agreed value of $437,775; an initial payment of $78,575; a term of 30 years; an investor percentage of 70%; and a maximum authorized debt of $303,075.

160. A full and accurate signed copy of the Plaintiff Meneses's HomeOwner Agreement was not provided to him at the time of signing.

161. Out of the loan proceeds, $29,933.90 was immediately disbursed at closing to pay down personal debts including a prior mortgage and credit card debts, and the rest of the loan proceeds were used to pay off a car loan and to pay for other personal expenses.

162. In connection with Meneses's HomeOwner Agreement, UAC recorded a second or subsequent mortgage lien on Meneses's home that secured Unison's right to "payment of the Investor Interest under the Unison Unison [sic] Homeowner Agreement."

163. The $437,775 "original agreed value" was reduced from the original appraisal of $449,000 by the deceptive 2.5% "Risk Adjustment," thereby immediately stripping Meneses of $7,857.50 worth of equity in his home (*i.e.,* 70% of the difference between the appraised value at the "original agreed value") pursuant to the lien placed on his home entitling Unison to that amount through the Appreciation Surcharge. For every dollar that the value of the home appreciates, Unison is entitled to an additional Appreciation Surcharge of seventy cents.

164. In connection with Meneses's HomeOwner Agreement, Defendants charged a 3% "Transaction Fee" of $2,357.25, and an unitemized "Settlement Fee" of $1,386.00," all of which were deducted from the original principal but immediately charged against the home's equity through the mortgage.

165. According to the most recent Quarterly Statement sent to Plaintiff Meneses, Defendants estimate the value of his home as of March 31, 2026 to be $540,699 to $660,885. Thus, Defendants are presently charging the Plaintiff Meneses an Appreciation Surcharge of between $68,000 and $152,000 on the original $78,575 loan. An image of the relevant section of that statement is below:

## Unison Quarterly Statement

### as of 03/31/2026

**Unison Agreement Information**

| | | |
|---|---|---|
| Agreement ID Number: FRX-436170 | Original Agreed Value: | Unison's Original Investment: |
| Effective Date: 07/07/2022 | **$437,775** | **$78,575** |
| Agreement End Date: 07/06/2052 | | |
| | Unison's Share of Change in Value: | Maximum Authorized Debt: |
| | **70%** | **$303,075** |



**Your Home's Recent Estimated Change in Value[1]**

## -4%

This percentage was calculated using your home's estimated value as of 03/31/2026 compared with its estimated value as of 12/31/2025. If you are a new customer, your home's current estimated value was compared with the Original Agreed Value from your Unison Agreement.



**Your Home's Current Estimated Value[2,3]**

| Low Estimate | High Estimate |
|---|---|
| **$540,699** | **$660,855** |

| $150,622 | $390,077 | $234,731 | $426,124 |
|---|---|---|---|
| Unison's Share | Your Share | Unison's Share | Your Share |

As a reminder, these are only estimates. When you decide to end your agreement, we will use the sale price or the valuation determined by an independent, third party appraisal as the basis for calculating your payoff amount to Unison.

166. As part of the transaction, UAC assigned the Meneses HomeOwner Agreement to Defendant Unison Midgard Holdings LLC.

167. **Santaniello Plaintiffs' Transaction**. In November 2019, the Santaniello Plaintiffs were in financial distress, having to pay a preexisting mortgage on their home, and racking up thousands of dollars in credit card debts after exhausting their savings to pay their monthly bills.

168. On or about November 9, 2019, Unison sent a notary to the Santaniello Plaintiffs home with the documents they were required to sign. The notary could not answer any questions relating to the underlying transaction; the notary's role was limited to directing them where to sign.

169. During the interaction with the notary, the Santaniello Plaintiffs entered into a Unison HomeOwner Agreement relating to their residence in Morristown, New Jersey. The HomeOwner Agreement reflects (among other terms): an original agreed value of $1,000,000; an initial payment of $175,000; a term of 30 years; an investor percentage of 70%; and a maximum authorized debt of $700,000.

170. A full and accurate signed copy of the Santaniello Plaintiffs' HomeOwner Agreement was not provided to them at the time of signing.

171. The Santaniello Plaintiffs used the loan proceeds to pay off outstanding credit card debt and to cover personal living expenses.

172. In connection with the Santaniellos' HomeOwner Agreement, UAC recorded a second or subsequent mortgage lien on the Santaniello's home that secured Unison's right to "payment of the Investor Interest under the Unison Homeowner Agreement."

173. On information and belief, the $1,000,000 "original agreed value" was reduced by a deceptive so-called "Risk Adjustment" assessed against the appraisal, thereby immediately stripping the Santaniello Plaintiffs of equity in their home pursuant to the lien placed on their home entitling Unison to that amount through the Appreciation Surcharge.

174. In connection with the Santaniello's HomeOwner Agreement, Defendants charged an unitemized "Transaction Fee" of $6,825, which was deducted from the original principal but immediately charged against the home's equity through the mortgage.

175. According to the most recent Quarterly Statement sent to the Santaniello Plaintiffs, Defendants estimate the value of his home as of March 31, 2026 to be $1,371,512 to $1,676,292. Thus, Defendants are presently charging the Santaniello Plaintiffs an Appreciation Surcharge of between around $255,000 and $465,000 on the original $175,000 loan. An image of the relevant section of that statement is below:



176. **Facts Relevant to All Plaintiffs' Transactions**. Plaintiffs had no meaningful ability to negotiate the standardized terms in Defendants' HomeOwner agreements.

177. Defendants' HomeOwner Agreements are residential mortgage loans in disguise, rendering Defendants' representations that they are "not a loan" deceptive and misleading.

178. Defendants, through their HomeOwner Agreements, surreptitiously and deceptively strip Plaintiffs of the equity in their homes, as Plaintiffs will not be able to keep their

homes unless they are able to shell out an exorbitant payoff amount that far exceeds the cash advanced.

179.    Defendants, despite acting as a residential mortgage lender in the state of New Jersey since at least 2019, did not obtain a residential mortgage license as required by N.J.S.A. § 17:11C-54 until January 2025.

180.    Plaintiffs have been injured by Defendants' conduct, including by their payment of the fees and charges prohibited under the RMLA, and by suffering a diminution in the value of their home equity relative to the cash advanced.

## V.    CLASS ACTION ALLEGATIONS

181.    Plaintiffs bring this action as a class action on behalf of themselves and all others similarly situated pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

182.    Plaintiffs propose the following Class, subject to refinement through discovery, consisting of:

> All natural persons who entered into a Unison HomeOwner Agreement secured by second or subsequent lien on a one-to-four family residential property located in New Jersey.

183.    The members of the Class are so numerous that joinder of all members is impracticable. Based upon review of public filings in county records offices throughout New Jersey, Defendants have entered into hundreds of HomeOwner Agreements with New Jersey homeowners.

184.    There are questions of law and fact common to the Class that predominate over individual issues, including:

   a.    whether Defendants' HomeOwner Agreements are, in substance, consumer credit transactions secured by second or subsequent liens on dwellings;

b. whether Defendants' form contracts, documents and/or uniform advertising are unconscionable or deceptive;

c. whether Defendants' form contracts, documents, and/or uniform advertising inform the homeowner of the total cost of the transaction;

d. whether Defendants' statements about the Agreement's terms, including but not limited to marketing these transactions as "not a loan," are unconscionable or deceptive;

e. whether the fees and finance charges including the transaction fees, the settlement fees, and the Appreciation Surcharge imposed at closing through the mortgage lien held against the home's equity violate New Jersey law; and,

f. the proper measure and scope of damages, injunctive relief, restitution, disgorgement, and statutory damages.

185. Plaintiffs' claims are typical of the claims of the Class because Plaintiffs, like all Class members, entered into Defendants' standardized HomeOwner Agreements secured by a second or subsequent lien on a New Jersey residence and were subjected to the same uniform deceptive and misleading marketing and illegal fee practices.

186. Plaintiffs will fairly and adequately represent the Class. Plaintiffs have no interests antagonistic to the Class, and they have retained experienced class counsel in consumer protection and complex litigation, including Flitter Milz, P.C. and Langer, Grogan & Diver, P.C.

187. A class action is superior to other methods for the fair and efficient adjudication of this controversy because individual Class members are unlikely to become aware that their rights have been violated absent class proceeding, and because adjudicating these claims on a class-wide basis will avoid inconsistent results and promote judicial economy.

188.    Common questions of law and fact predominate over any questions affecting only individual class members.

189.    Defendants have acted or refused to act on grounds that apply generally to the class such that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## VI.    CLAIMS FOR RELIEF

### COUNT I – Violation of the New Jersey Consumer Fraud Act (CFA)
### N.J.S.A. § 56:8-1 *et seq.*

190.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

191.    Defendants engaged in unlawful practices under the CFA, including but not limited to affirmative misrepresentations, knowing omissions, and unconscionable commercial practices, in connection with the advertising, marketing, sale, and servicing of the Unison HomeOwner product to New Jersey consumers.

192.    UAC and REX, acting through the "Unison" brand, created, approved, and disseminated marketing and sales materials targeting New Jersey homeowners (including representations that the product is "not a loan"), and offered standardized HomeOwner contracts drafted to characterize a home-secured credit transaction as an "option" or "home equity investment."

193.    UAC executed the HomeOwner agreements and caused the recording of lien instruments against consumers' residences.

194.    UMH and/or UIM acquired and held the HomeOwner agreements and liens, and serviced, administered, and enforced them, all for the financial benefit of the Unison enterprise and its affiliates.

195.    As alleged herein, Unison engages in commercial practices that are unconscionable or abusive, deceptive, unfair and knowingly conceal, suppress, or omit material facts with intent that others rely upon such concealment, suppression or omission in connection with the sale of their HomeOwner Agreement products, in violation of N.J.S.A. § 56:8-2, including but not limited to:

a.   Making the process of closing the Agreement a high-pressure situation, sending to their homes a notary who had no knowledge of the underlying details of the transaction and were unable to answer any questions other than where to sign.

b.   Requiring or requesting homeowners to sign the Agreements but nonetheless failing to provide them with a full and accurate copy of the signed documents at the time of signing. N.J.S.A. § 56:8-2.22.

c.   Providing false, deceptive, and misleading statements in the transaction documents, including false statements that the product "is not a loan," which is an improper attempt to waive borrower rights under the RMLA, N.J.S.A. § 17:11C-86 ("Any agreement to waive any provision of this act shall be unenforceable and void").

d.   Charging fees and other charges that are prohibited under the RMLA, including "Transaction Fees," "Settlement Fees," the Appreciation Surcharge.

e.   Charging points—including the Appreciation Surcharge—in violation of N.J.S.A. § 46:10B-10.

f.   Charging discount points not permitted under N.J.S.A. § 46:10B-11.1.

g.   Deceptively modifying the appraised value of the home through the imposition of a so-called "Risk Adjustment" that ensures that Defendants start "in the money" on the loan;

h.  Mischaracterizing the transaction as an "option" or "investment" rather than a credit product, loan, and/or mortgage product, even though Defendants structured the agreements to ensure that they will effectively never receive less than the advance it paid to the consumer and it being entirely illusory that Defendants would voluntarily choose not to "exercise their option" to secure repayment.

i.  Including void and unenforceable arbitration terms prohibited by federal law for residential mortgage loans;

j.  Representing itself as a "partner" with the homeowner during marketing, even though it expressly disclaims its role as a partner in the HomeOwner Agreement, and includes numerous provisions in the HomeOwner Agreement that are contrary to a partnership, such as placing all costs of the transaction on consumers while ensuring Unison reaps the benefits.

k.  Failing to maintain appropriate licensure or otherwise comply with lending laws;

l.  Structuring the HomeOwner Agreement over the course of dozens of pages, at least eight different documents, and using complex formulas, cross-references, and definitions to prevent consumers from understanding the terms, costs, and consequences of the transaction.

m.  Providing homeowners with confusing quarterly billing statements where it continues to describe the contract as an "equity-sharing agreement" rather than a loan, and itself as a "financial partner" despite explicit language in the HomeOwner Agreement disclaiming partnership status and the fact that the transaction is one-sidedly designed to Unison's benefit.

n.  Placing restraints on consumers' use of their homes, including restrictions on renting out the home during the term, imposing a maximum debt amount, restricting homeowners' ability to obtain refinancing and other mortgage products, and imposing a penalty for the sale of the home during the Restriction Period or a Special Termination.

o.  Prohibiting consumers to repay the mortgage loans at any time without penalty during the first several years of the agreement, in violation of N.J.A.C. § 3:15–10.1(b), to ensure that the home appreciates in value prior to repayment and thus ensure that both the principal and the Appreciation Surcharge will be recouped.

p.  Otherwise placing the Plaintiffs and the Class in a highly lopsided and unfair transactions that benefit Unison while placing the costs and risks on consumers.

196.  All of this conduct and these practices evince and reflect a lack of good faith and fair dealing on the part of Defendants.

197.  Plaintiffs and Class members suffered ascertainable losses as a result of Defendants' unlawful conduct, including but not limited to the improper fees and finance charges paid or imposed at origination, and the loss of home equity and economic value through Defendants' secured right to extract the improper fees and finance charges from equity in the consumer's residence.

198.  Accordingly, Defendants are liable to Plaintiffs and the Class for treble damages, attorneys' fees, and costs pursuant to N.J.S.A. § 56:8-19, as well as for such other legal and equitable relief as this Court deems just and proper.

**COUNT II – Violation of the Truth-In-Consumer Contract, Warranty and Notice Act**
**N.J.S.A. § 56:12-14 *et seq.***

199.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

200.    Plaintiffs and Class members are "consumers" within the meaning of the TCCWNA.

201.    Defendants are "sellers," "creditors," and/or "lenders" within the meaning of the TCCWNA because, in the course of their business, they offered, entered into, used, and/or sought to enforce written consumer credit contracts with New Jersey homeowners relating to dwelling-secured transactions and services.

202.    Defendants offered, entered into, and used written consumer credit contracts—Defendants' standardized HomeOwner Agreements—relating to the sale, extension of credit, and/or performance of services in connection with consumers' residential dwellings.

203.    REX, acting through the "Unison" brand and its consumer-facing materials, offered the HomeOwner Agreement product and the standardized contract terms to New Jersey homeowners; UAC entered into the HomeOwner Agreements as the named contracting party and caused lien instruments to be recorded; and UIM/UMH used and sought to enforce the standardized contract terms as holders, servicers, administrators, and/or assignees of HomeOwner Agreements and liens.

204.    The TCCWNA prohibits a seller, creditor, or lender from offering or entering into a written consumer contract that includes any provision that violates a clearly established legal right of a consumer or responsibility of a seller, creditor, or lender, as established by state or federal law at the time the contract is offered or signed. *See* N.J.S.A. § 56:12-15.

205.    Defendants violated the TCCWNA by offering and entering into HomeOwner Agreements that expressly or indirectly include one or more provisions for payment of a "Transaction Fee," a "Settlement Fee," and the Appreciation Surcharge, which all violate clearly established state law applicable to residential mortgage loans.

206.    Plaintiffs and Class members are "aggrieved consumers" under the TCCWNA because they were offered and entered into consumer contracts containing provisions for payment of unlawful charges including for payment of a "Transaction Fee," a "Settlement Fee," and the Appreciation Surcharge, which are prohibited by New Jersey law, and which in fact have already been assessed against the equity of the consumer's home through the mortgage lien.

207.    Plaintiffs and the Class are entitled to statutory damages of not less than $100 per violation per consumer, actual damages as proven, reasonable attorneys' fees, and costs, and such declaratory and injunctive relief as the Court deems proper. *See* N.J.S.A. § 56:12-17.

### COUNT III – Violation of the Home Ownership Security Act
### N.J.S.A. § 46:10B-22 *et seq.*

208.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

209.    Defendants' business model is also an intentional end-run around the New Jersey Home Ownership Security Act of 2002 ("HOSA"), which was designed to combat abusive and overreaching mortgage lending practices and to protect homeowners from loss of equity in their homes. N.J.S.A. § 46:10B-23(a)-(b).

210.    Defendants use contract provisions that afford them sole discretion to accelerate indebtedness, in violation of the HOSA. N.J.S.A. § 46:10B-25(e).

211.    Defendants, intentionally and in bad faith, to attempt to avoid application of the HOSA, divided each loan transaction into separate parts by specifically including an "option"

operating as a hidden finance charge triggered as a balloon payment at the end of the loan term, in violation of the HOSA. N.J.S.A. § 46:10B-27(d).

212.    Defendants' claimed "option" and the separate components of the transaction constituting its HomeOwner Agreement were surreptitiously designed, in bad faith, to avoid application of the HOSA and residential mortgage lending laws generally, in violation of N.J.S.A. § 46:10B-27(d).

213.    Defendants' conduct was malicious and reckless with respect to the rights of Plaintiffs and the Class. N.J.S.A. § 2A:15-5.12.

214.    Plaintiffs and the Class are entitled to statutory damages under N.J.S.A. § 46:10B-29(b)(1)(a) or alternatively trebled damages under N.J.S.A. § 56:8-19, punitive damages, reasonable attorneys' fees, and costs, and such declaratory and injunctive relief as the Court deems proper. *See* N.J.S.A. § 46:10B-29(b).

## COUNT IV – Violation of the Residential Mortgage Lending Act
### N.J.S.A. § 17:11C-51 *et seq.*

215.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

216.    Defendants engage in mortgage lending in New Jersey under the guise of "Homeowner Agreements" deceptively pitched as "option" contracts, but which are in reality residential mortgage loans.

217.    Under the RMLA, "[n]o residential mortgage lender, residential mortgage broker, or mortgage loan originator shall charge or exact directly or indirectly from a borrower or any other person any commission, bonus, fee, or charge not authorized by this act." N.J.S.A. § 17:11C-75(l); *see also* N.J.S.A. § 17:11C-74 ("No residential mortgage lender or residential mortgage broker may charge any fee not expressly authorized either by this section or by the commissioner

44

by regulation."). Furthermore, "[a] licensee acting as a residential mortgage lender shall not contract for, charge, receive or collect directly or indirectly, any of the following in connection with a secondary mortgage loan: a broker's or finder's fee; commission; expense; fine; penalty; premium; or any other thing of value other than the charges authorized by this act." N.J.S.A. § 17:11C-80(a).

218.    Defendants directly and indirectly contracted for, charged, and indirectly collected or exacted "Transaction Fees," "Settlement Fees," and the Appreciation Surcharge through the mortgage lien on the consumer's home, none of which are identified as permissible fees at N.J.S.A. § 17:11C-74, N.J.S.A. § 17:11C-80, or anywhere else in the RMLA.

219.    At all times relevant, Defendants acted knowingly and willfully in violation of the RMLA.

220.    Accordingly, Defendants have forfeited any right to collect anything other than the principal of the loan (*i.e.*, the "Initial Payment") from Plaintiffs and Class Members' home equity and are liable to Plaintiffs and the Class for treble the amount of fees and charges collected in excess of those authorized by law. N.J.S.A. § 17:11C-81(a).

**COUNT V – Civil Conspiracy to Violate the CFA and New Jersey's Residential Mortgage Lending Laws, including the RMLA, and the HOSA**
**New Jersey Common Law**

221.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

222.    Under New Jersey law, a civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, resulting in damage to the plaintiff.

223.    Defendants knowingly combined, associated, agreed, and acted in concert to design, market, originate, assign, service, and enforce the HomeOwner Agreements in New Jersey

45

as a purported "home equity investment" and "option" to mislead consumers and evade New Jersey's residential mortgage lending requirements. The object of the conspiracy was to engage in conduct constituting violations of the CFA and New Jersey's residential mortgage lending laws, including the use of deceptively marketed contracts to charge, collect, and receive fees and charges prohibited under New Jersey law.

224.    Each Defendant committed overt acts in furtherance of the conspiracy. By way of example: REX directed and controlled the overall scheme and approved marketing and standardized contract terms; UAC contracted directly with New Jersey homeowners, charged and collected transaction fees, caused lien instruments to be recorded, and assigned the HomeOwner Agreements other entities like UMH; UIM funded, acquired, held, serviced, administered, securitized, and enforced the HomeOwner Agreements and liens. These acts were intentional and were performed pursuant to a common plan to profit from homeowners' equity while avoiding the requirements and prohibitions applicable to residential mortgage lending in New Jersey.

225.    Defendants collectively entered into an agreement or understanding to violate New Jersey law under the CFA by misleading consumers as to the very nature of the product being offered.

226.    Defendants collectively entered into an agreement or understanding to use contracts that violate New Jersey's residential mortgage lending laws, including but not limited to the HOSA, and to intentionally and in bad faith attempt to evade application of such laws.

227.    Discovery will show that Defendants' aforesaid agreements or understandings are reflected in documents and communications in their possession, custody, or control, including communications with owners, members, investors, and c-level employees.

228.   As a direct and proximate result of Defendants' conspiracy, Plaintiffs and Class members suffered damages and ascertainable losses, including origination and transaction fees, the impairment of their property rights, and the loss of home equity through Defendants' extraction of inflated payoff amounts.

229.   Defendants are jointly and severally liable for all damages caused by the unlawful acts committed in furtherance of the conspiracy, together with all other relief available at law or in equity.

## VII.   PRAYER FOR RELIEF

On behalf of themselves and all others similarly situated, Plaintiffs demand judgment against Defendants as follows:

(a)   Certifying this action as a class action pursuant to Rule 23(a), (b)(2), and (b)(3); appointing Plaintiffs as Class Representatives; and appointing Flitter Milz, P.C. and Langer, Grogan & Diver, P.C. as Class Counsel;

(b)   Declaring that Defendants' HomeOwner Agreements are, in substance, consumer credit transactions secured by a dwelling and secondary residential mortgage loans under and subject to TILA and New Jersey's residential mortgage lending laws, including the RMLA and the HOSA;

(c)   Declaring that the marketing and sale of Defendants' HomeOwner Agreements constitutes unconscionable, abusive, deceptive, unfair conduct under the CFA;

(d)   Declaring that the fees and charges related to Defendants' HomeOwner Agreements, including the "Transaction Fees," the "Settlement Fees," and the Appreciation Surcharges, collected and assessed against the equity in Plaintiffs' and Class Members' homes are unauthorized charges in relation to a residential mortgage under the RMLA;

47

(e)     Enjoining, reforming, or otherwise declaring unenforceable the mortgages against Plaintiffs' and Class Members' property for all amounts secured in excess of the principal loan amount originally advanced to the Plaintiffs and Class Members;

(f)     Awarding Plaintiffs and the Class damages, including trebled and statutory damages under the CFA and HOSA;

(g)     Awarding Plaintiffs and the Class attorneys' fees and costs under the CFA and HOSA;

(h)     Awarding prejudgment and post-judgment interest as permitted by law; and

(i)     Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The Plaintiffs hereby demand trial by jury as to all issues in the above matter.

## NOTICE TO ATTORNEY GENERAL

A copy of the Class Action Complaint will be emailed to the Attorney General of the State of New Jersey at NJCFApleadings@law.njoag.gov pursuant to the New Jersey CFA's requirements, N.J.S.A. 56:8-20.

Date:   June 15, 2026                          Respectfully submitted,

                                               *s/Jody T. López-Jacobs*
                                               Jody T. López-Jacobs
                                               (NJ Atty. Id. 164492015)
                                               Andrew M. Milz
                                               (NJ Atty. Id. 000932008)
                                               **FLITTER MILZ, P.C.**
                                               450 N. Narberth Ave., Suite 101
                                               Narberth, PA 19072
                                               Tel: (888) 668-1225

s/David A. Nagdeman
David A. Nagdeman
(NJ Atty. Id. 529022025)
Kevin D. Walsh
(NJ Atty. Id. 30511999)
**LANGER, GROGAN & DIVER, P.C.**
1717 Arch Street, Suite 4020
Philadelphia, PA 19103
Tel: (215) 320-5660

*Attorneys for Plaintiffs and the Class*